*AUSA Assigned: RRB*

*County of Investigation: Okanogan*

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Dec 17, 2021

SEAN F. McAVOY, CLERK

*In Re: Affidavit for Criminal Complaint charging SHAWN VINCENT BEST, SR with two counts of Domestic Assault by a Habitual Offender*

## AFFIDAVIT

STATE OF WASHINGTON    )
                       ) ss
County of Spokane      )

## INTRODUCTION AND AGENT BACKGROUND

**1.** I, Brian Hoff, Special Agent, being first duly sworn on oath, deposes and states:

**2.** Your affiant is a Special Agent (SA) of the Federal Bureau of Investigation. This affidavit is in support of an arrest warrant for SHAWN VINCENT BEST, SR.

**3.** Your affiant has been a Special Agent with the FBI since April 2010 and is currently assigned to the Spokane Resident Agency within the Seattle Field Office of the FBI, which conducts investigations into violent crime located within Indian country in conjunction with the FBI's Salish Safe Trails Task Force, a multi-agency Federal and Tribal task force. Prior to this assignment, your affiant investigated federal terrorism charges, while assigned to the joint terrorism task force in the Boston Division. I also have been assigned to the Seattle Division, Spokane Resident Agency Safe Streets Task Force for nearly years, where I was responsible for investigating, among other things, violations of the Controlled Substances Act.

Affidavit of Brian Hoff - 1
SHAWN VINCENT BEST, SR:  Criminal Complaint – 2:21-MJ-00554-JAG

4.     In connection with my work in Indian Country, I attended the joint FBI/Bureau of Indian Affairs (BIA) basic training course in Artesia, New Mexico for agents assigned to investigate crimes on Indian Reservations. Before relocating to Spokane, Washington, your affiant was assigned to the Minneapolis Division. There, and over the course of approximately three years, I handled violent crime investigations on several Indian reservations located within North Dakota. More recently, and after joining the Spokane Resident Agency, I was assigned to again work Indian country offenses, including the investigation of violent crimes in Indian country on the Confederated Tribes of the Colville Reservation.

5.     My experience as an FBI agent includes, but is not limited to, conducting physical surveillance, interviewing witnesses and subjects, executing search and arrest warrants, and operating informants. I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. § 2510(7), as a Special Agent of the FBI, and I am empowered by law to conduct investigations of, and to make arrests for, federal felony offenses.

6.     This affidavit does not contain all of the information known to me or to law enforcement regarding this investigation, but rather contains only those facts believed to be necessary to support the criminal complaint. I have personally participated in this investigation and the following information is derived from my personal observations, review of official court documents, and information provided by other sworn law enforcement officers and community corrections personnel.

## INVESTIGATION AND PROBABLE CAUSE

7.     As set forth herein, your affiant submits there is probable cause to believe that SHAWN VINCENT BEST, SR. (hereafter "BEST") violated 18 U.S.C. § 117 (Domestic Assault by a Habitual Offender) on or about August 12, 2021 and again on or about September 21, 2021.  As described in further detail below, BEST

physically assaulted an individual identified herein as L.T. Notably, BEST also has a history of domestic violence including four apparent convictions in state and tribal courts for domestic assault.  Based on the FBI's investigation, including the receipt of Judgements and Sentences from the Colville Tribe and Gila County, Arizona, BEST has been convicted of the following Domestic Violence Offenses:

- Two counts of Assault on separate dates in Case No. 2001-24386 in Colville Tribal Court – Nespelem Washington.  Based on the case file, charging documents, and BEST's guilty plea, the victim of the offense was BEST's domestic and/or intimate partner at the time of the assaultive conduct.[1]

- Assault Domestic Violence in Case No. J043CR2006000826 in Globe Regional Justice Court – Gila County, Arizona

- Battery (Domestic Violence) in case Nos. CR-2013-36164 and CR-2013-36165 in Colville Tribal Court – Nespelem, Washington

The assaultive conduct that is the subject of this affidavit is set forth below, beginning with the August 12, 2021 incident, which is followed by the September 21, 2021 assault.

### August 12, 2021 Assault

**8.**     On August 12, 2021, L.T. called 911.  Through tears, she reported she was at a friend's house, stating "my boyfriend beat me up earlier today."  L.T. further explained BEST also took her cell phone and pain medication, throwing those items

---

[1] The 2001 assault conviction predates amendments to the Colville Tribal code specifically criminalizing domestic assault.  Consistent with *United States v. Hayes*, 555 U.S. 415 (2009), courts should apply the categorical approach at the pre-trial stage to determine whether the defendant has "at least two final convictions in federal, state, or tribal court for offenses that are categorical matches to 'any assault, sexual abuse, or serious violent felony' as defined by federal law." *See United States v. Cline*, No. 19-cr-23, 2020 WL 1862595 (W.D. Wash. Apr. 14, 2020). If such convictions exist, as they do here, the government may introduce extrinsic evidence to satisfy 18 U.S.C. §117's domestic-relationship element. *Id.*

"across a field." L.T. described threats that BEST made against her to "beat the fuck out of [L.T.]"

9. Tribal Police Officer Bigboygribble responded and interviewed L.T., who confirmed BEST assaulted her. L.T. explained in interviews with law enforcement that she was at her aunt's house after shopping and needed a ride back to BEST's residence. One of the aunt's friends, who happened to be a male, offered to give L.T. a ride. She accepted the offer and traveled back to BEST's home with the male friend. When L.T. arrived, BEST apparently saw her with another man and got upset. After taking some beer out of the car, BEST struck L.T. on the left side of her face with a closed fist. BEST was screaming and angry that L.T. brought another man to his home and demanded to know whether L.T. "fucked" the other man. L.T. was shocked by this reaction. She started to cry and responded, "No." L.T. further explained she went into the bedroom, into the space between the bed and the wall. There, BEST shoved L.T., causing her to fall into a laundry basket. L.T. explained that BEST's son and his family were in the living room of the residence and would have heard the argument. No one, however, intervened when BEST assaulted L.T.

10. L.T. explained that during the altercation, BEST told her that he wanted L.T. out of the house. L.T. then gathered her things and went to a neighbor's home. The neighbor told L.T. he was wondering when L.T. would show up. According to the neighbor, BEST's girls usually ended up leaving after having been beaten. Following the August 2021 assault, L.T. obtained a temporary protection order against BEST and went to a shelter for approximately two weeks.

11. Not long after she entered the shelter, L.T. reconciled with BEST, and moved back in with him. Once reconciled, L.T. missed a Zoom call for a follow-up hearing related to the temporary protection order. L.T. was with BEST at the time of the scheduled hearing, and L.T. quickly had to mute and reject the Zoom call because BEST asked who was calling.

12.     L.T. did not go to the hospital in connection with the August 12, 2021 assault.  Tribal Police took photographs of her face and noted that police did not observe bruising or acute injuries to L.T.'s person.  Notwithstanding that the report specifies that Tribal Officer Bigboygribble did not observe "red marks or bruising," a diagram of the victim's face notes an injury to her right cheek.

### September 21, 2021 Assault

13.     On September 24, 2021, L.T. called personnel from the Okanogan County District Court in a whisper and complained that BEST again assaulted her, explaining "he was going to kill me if I went to court to testify."  Personnel from the Court contacted Tribal Police and asked the Police to respond to BEST's residence.  Upon arrival, Tribal Police Officer Michael Day made contact with BEST, who initially appeared to be cooperative.  Officer Day placed BEST into handcuffs, and BEST became belligerent, yelling, "That fucking bitch, I knew it."

14.     Tribal Police Officer Day then spoke with L.T., who was extremely upset and having a hard time explaining what happened.  L.T. explained that BEST kicked her in multiple places and struck her with a leather belt across her back multiple times.   She also explained that BEST hit her with a broom between her legs.  At this point Emergency Medical Services (EMS) arrived on scene and L.T. asked if she could talk to a female officer.  EMS then transported L.T. to Mid Valley Hospital in Omak, Washington.  Shortly after that, Tribal Police Officer Paulette Manuel, who is a female officer, went to Mid Valley Hospital to interview with L.T.  There, Officer Manuel asked if she could speak with L.T., who agreed to an audio-recorded interview.  In an emotional, recorded interview from the hospital, L.T. provided the following information:

- L.T. explained that the assault took place on Tuesday night, which was September 21, 2021. The only people present in the home were L.T. and BEST. While L.T. was on her cell phone, messaging a guy who attends

    Narcotics Anonymous ("NA") meetings, BEST got mad saying, "Oh you talking to all your boyfriends out there."

- At this point, L.T. was sitting in a chair in the dining room. BEST kicked L.T. in the left shin with his slip-on shoes. He also kicked L.T. on her right thigh and lower abdomen area. After he kicked L.T., BEST asked, "Where's your boyfriend now?"

- After being kicked, L.T. went to the bedroom – to the side of the bed. BEST cornered L.T., took his belt, and hit L.T. in the back with the belt two times. BEST looked as though he was going to strike L.T. a third time with the buckle end, but then threw the belt to the ground. BEST stated, "If [L.T.] was to ever say anything or call the cops there would be no way that they would be able to find her body." BEST further stated, he would "harm [L.T.'s] kids." Officer Manuel asked L.T. if she believed BEST was capable of doing something like that to her or the kids, and L.T. responded, "Yeah."

- During the interview, Tribal Officer Manuel asked what else happened. At this point, L.T. became emotional – she was crying and put her head down. L.T. then proceeded to describe a sexual assault that occurred the same day BEST hit her for texting another man.

- L.T. explained that she had changed into her pajamas after BEST physically assaulted her with the belt. After doing so, BEST said something to the effect of, "I wish you were fucking dead." L.T. tried to go to sleep, and may have fallen asleep at some point, but she remembered hearing what sounded like a pornographic video being played on BEST's phone.

- L.T. explained that after hearing the pornographic video, BEST "got on top of me," and L.T. told BEST to stop. BEST responded with something to the effect of, "Fucking bitch, that's my pussy and no one else's. Oh, what, you saving it for that other guy?" L.T. told BEST to get off of L.T., but he refused. BEST pulled down L.T.'s sweatpants and ripped her underwear. BEST had L.T. on her back. Her knees were to her chest. L.T.'s legs were touching the wall at the head of the bed.

- Even though L.T. told BEST to stop, he refused. L.T. cried out, "It hurts, it hurts so bad." The more she begged BEST to get off of her, BEST just went harder and harder. In her interview, L.T. became emotional as she explained that BEST "wouldn't get off" of her. L.T. also indicated to Officer Manuel that BEST penetrated her vaginally.

- After BEST penetrated L.T., she "blacked out." She expressed that she did not know what happened after that, but woke up on Wednesday, which was September 22, 2021. That morning, BEST asked L.T., "How do you feel? Do I have to take you to the hospital or what?"

- L.T. explained in her interview that by September 23, 2021, she barely could get out of bed. She struggled bending over, grabbing items off the floor, or squatting down because it hurt so badly. In response to Officer Manuel's question whether L.T. tried to leave, L.T. stated, "I tried." She indicated that her injuries included, among other things, an abrasion to her lower back.

15. On September 24, 2021, the same day L.T. was treated at Mid Valley Hospital, L.T. was released. L.T. then went to a support center for DV victims and was placed into temporary emergency housing. On September 29, 2021, which was five days later, another Colville Tribal Officer, R. Lopez contacted L.T., after L.T. returned to Mid Valley Hospital due to continued pain in her neck. L.T. explained to Officer Lopez that she (L.T.) was being flown to Harborview Hospital in Seattle and asked Officer Lopez for help with some outstanding personal matters. L.T. explained that she learned from hospital staff that there was an abscess inside her neck, which L.T. believed was from the assault, indicating that BEST choked L.T. To treat the abscess, L.T. was being transferred to Harbor View Hospital in Seattle, where she has remained while being treated for the abscess. Before being transferred to Harborview, L.T. told Officer Lopez she was concerned about what would happen to BEST if L.T. died.

16. L.T. spent the next several weeks in the hospital to treat the abscess, which became life threatening. On October 5, 2021, L.T. was again interviewed. This time by FBI Special Agent Kaylee Johnson at Harborview Medical Center in Seattle, Washington. In the interview, L.T. provided the following information:

- L.T. advised SA Johnson that it was difficult to speak due to her neck injury, which she suffered from BEST choking her. L.T. explained that she learned from her doctors that she had internal bruising in her neck, which caused an

- abscess to form, and the abscess became infected with Methicillin-Resistant Staphylococcus Aureus (MRSA), which is a type of staph infection.

- L.T. again recounted the events from September 21, 2021 – i.e., the assault L.T. previously described to Officer Manuel. When BEST kicked L.T. in the leg, BEST did so on her left leg, which already was infected. After BEST stepped away, L.T. got up and walked to the bedroom and put on her shoes and coat. BEST then asked, "Where do you think you're going?" He also told L.T. to "take your coat and shoes off." L.T. expressed that she wanted to leave, but BEST stated, "You ain't going nowhere." Instead, BEST grabbed L.T.'s coat and forced it off. BEST then grabbed a belt and struck L.T. in the back several times with the leather side of the belt.

- Upset by the interaction, and feeling that she was stuck in the situation, L.T. went to the bathroom and swallowed an entire bottle of prescription medication. L.T. exited the bathroom and told BEST, "this is what you made me do" and threw the empty bottle at BEST. After taking this medicine, L.T. became drowsy and eventually lost consciousness. She later woke up when BEST threw water on her.

- Later that evening, BEST got on top of L.T., while she was on the bed. L.T. repeatedly told BEST, "no" and "stop." BEST, however, was undeterred. He undressed L.T., ripped her underwear off, and inserted his penis in L.T.'s vagina. He did not use a condom. L.T. remembered that her legs were hitting the baseboard of the bed. L.T. described the sexual assault as painful. When L.T. again told BEST, "no" and asked him to stop, he placed one hand around L.T.'s throat and squeezed. L.T. could not breathe, and she lost consciousness.

- L.T. explained in her FBI interview that she later woke up and saw BEST standing next to the bed. BEST acted as if nothing had happened, and asked L.T. if she was hungry. The next day, L.T. was extremely sore and felt as if she could not move. L.T. described extreme pain "down there" – in an apparent reference to her vaginal area. L.T. also felt emotionally "numb" after the sexual assault. L.T. reiterated throughout the interview that she was afraid of what BEST might do, describing BEST as unpredictable.

- At some point between the sexual assault on September 21, 2021 and when police arrived on September 24, 2021, BEST's family visited the residence. The family stayed outside, and L.T. stayed inside. BEST was working on some tools outside the house during this visit. L.T., however, felt she could

    not get away because BEST would see if she tried to do so. Again, because of the prior assaults, L.T. was afraid BEST would hurt her if she tried to leave.

- The next day, BEST and L.T. had an argument, and BEST told L.T. to leave. L.T. immediately went outside and called the district court to apologize for missing the Zoom appointment. L.T. was afraid to call the police, however, because BEST had threatened to kill her and harm L.T.'s children. L.T. explained to SA Johnson that the woman from the district court called police, who arrived while L.T. was at the house. L.T. pleaded with the woman to not call the police because she was scared of what BEST might do. Nonetheless, when police ultimately arrived, L.T. felt extreme relief.

- L.T. explained to SA Johnson that the same day police arrived, which again was September 24, 2021, L.T. went to the hospital for medical treatment. L.T. also underwent a SANE exam. The hospital did not have any beds due to COVID-19, so L.T. left. After she left, however, L.T.'s throat was still extremely painful, so she returned to the hospital. According to L.T., medical personnel indicated that she had bruising on her neck from when BEST had choked her. As described above, this bruising caused an abscess to form in L.T.'s throat.

- In her interview with SA Johnson, L.T. repeatedly emphasized she was afraid of BEST and could not stop thinking about the assault. She expressed concern that BEST may try to do the same thing to other women. L.T. had marks on her right leg, which L.T. stated were from BEST kicking her in the leg. During the interview, L.T. gave consent for SA Johnson to take photographs of L.T.'s neck and leg. SA Johnson photographed L.T.'s right leg. SA Johnson did not observe any visible markings on L.T.'s neck.

17.    Photographs taken in the aftermath of the assault are of poor quality, and it is hard to discern the injuries from the pictures. That said, some of the injuries depicted appear to be consistent with L.T.'s account of the assault.

18.    Medical records from Harborview Hospital appear to largely be consistent with L.T.'s account. According to the records, L.T. reported a "particular assault episode where he strangled the patient (she reports losing consciousness)" and having "horrific flashbacks." The medical reports further indicate L.T. suffered a "recent history of traumatic strangulation associated with intimate partner violence

8 days ago. She presented to outside hospital where a CT of the neck was performed and shown to have no acute trauma. Over the past week she has developed progressive hoarseness and throat pain." The medical records indicate that a CT scan was preformed, which demonstrated a "retropharyngeal and prevertebral abscess." It is my understanding that such an abscess may be caused by a bacterial infection, resulting in a collection of pus in the back of the throat. While the records do not definitively establish that strangulation led to the abscess, the medical reports indicate the strangulation may have caused tissue damage, resulting in the extension of the infection.

19. On December 17, 2021, the FBI reviewed a copy of the information conveyed in L.T.'s SANE exam. While DNA testing relating to the exam is still pending, the notes of the exam indicate that L.T. made statements consistent with those to law enforcement regarding the September 21, 2021 assault. The notes from the SANE exam do not indicate that L.T. described strangulation at that time. That said, and as noted above, in her subsequent interviews, L.T. described being strangled and choked. During the SANE exam, she also described pain to her neck.

20. The FBI also received copies of Lifeline records dated September 29, 2021, the day L.T. was transferred from Omak to Harborview Hospital to treat the abscess in her neck, which apparently was caused by the strangulation. The Lifeline records indicate that L.T. advised medical personnel that her boyfriend hit her on the neck with a belt and hit her multiple times in the crotch region. L.T. added that her boyfriend assaulted her because BEST's friend relapsed into alcoholism and L.T. refused to give that friend a ride. L.T. again described a sexual assault, explaining that BEST "grabbed her neck with both hands," and that she couldn't remember anything after that. L.T. further complained of extreme pain to her neck and vagina, describing the pain as a 10 on a scale of 1 to 10.

21. On December 17, 2021, I received excerpts of jail calls involving BEST, who generally denied holding L.T. against her will and claimed that "he never fucking beat that bitch up." In other calls, however, he stated that he would likely accept a plea as long as it did not involve domestic violence.

## CONCLUSION

22. Based upon the information above and your affiant's knowledge and experience, your affiant believes that SHAWN VINCENT BEST violated 18 U.S.C. § 117 (Domestic Assault by a Habitual Offender).

_____
Brian R. Hoff, Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN in person and electronically before me this \_\_\_17th\_\_\_ (signed) day of December, 2021.

_____
James A. Goeke
United States Magistrate Judge